Good morning. May it please the court. Becky James on behalf of the appellants. We'd like to reserve four minutes for rebuttal. Just to give the court a little bit of a road map, we do have three attorneys planning to argue today. As the court referenced, I'm planning to argue for seven minutes. And I will be addressing the Bivens and qualified immunity issues as they relate to the inadequate care claim. My co-counsel, Jennifer Merkel, will take over at that point and will focus. She'll focus in particular on the transfer issues and excessive force claim and anything else I miss. And Mr. Lawrence will be handling our rebuttal. Very well. This case is unique. Never before has the Supreme Court or this court or any circuit court, in fact, recognized a Bivens cause of action for a pregnant inmate's claim of inadequate prenatal care. The Supreme Court has cautioned repeatedly and heavily against creating new Bivens actions. And this is not the case to do so. This court recently considered the issue of expanding Bivens in the en banc consideration in Watanabe, which was a case relied upon by the district court and the plaintiff in this case. Eleven members of the court dissented in that case on the denial of en banc, focusing primarily on the existence of alternative remedies available. And that issue, of course, is present here, too. We have the same alternative remedies present here. And although the court did deny en banc in Watanabe, the members of the court did encourage the Supreme Court to take this case up. The petitioner has filed a petition for certiorari in that case very recently, raising two issues. One, the existence of alternative remedies. And two, whether lesser or lesser injuries might still give rise to a Bivens action. An argument that it does not. I would urge the court, if the court is considering, I mean, first of all, to read the cert petition, it's a good read. But also, if the court is considering at all expanding Bivens in this case, to perhaps wait and see what the court does in Watanabe, because that case is pending before the Supreme Court. So you would – is your argument that we should hold this in abeyance until we figure out whether or not the Supreme Court grants cert in Watanabe? I think so, unless the court – unless the court could avoid the issue by deciding it on qualified immunity, for example. So if the court's not going to address the Bivens claim but finds it easier to resolve the case on qualified immunity, I think the court could go ahead and decide that. But at this point, we do have to follow Watanabe, you would agree? At this point, the majority decision in Watanabe controls, yes. Okay. But this case is very distinguishable from Watanabe as well. In Watanabe, there actually was an illness – I mean, an injury, excuse me – that was not treated, and I – Well, why is the allegations of preeclampsia not enough here? Well, for one thing, the preeclampsia did not come up as a – as a possibility until about April. There was no evidence, no allegations, excuse me, in the complaint that anyone knew that she was at risk for preeclampsia before that time or even at that time that she told the defendants. The complaint doesn't allege what she really told anybody when. But the first time – The preeclampsia is not a serious condition. It's just that none of the defendants were aware of that. Well, she hasn't alleged that the defendants were aware. She hasn't alleged that the defendants were aware of that. I mean, no court has really held – has really addressed this issue. So is preeclampsia a serious medical condition? Well, we don't – I think you should concede that. I think it's pretty serious. Right. Well, it's a condition. It is a condition. At least that is something beyond the pregnancy alone, which initially, you know, what she was, you know, concerned about, her concerns about her pregnancy really related to the lack of prenatal care leading up to that point. And for the – when she talks about the, you know, the five months, it isn't really five months. She did receive an ultrasound and did see a doctor in that time, but not seeing an OBGYN, that was really her primary complaint in this case. There's no evidence, no allegations in the complaint about that any defendant was aware that she had preeclampsia, so – or was at risk for it. And I think that, you know, of course Plaintiff will – is trying to shoehorn this case into a Carlson claim and say it's not a new Bivens action. I would submit this is meaningfully different from Carlson. As I've kind of just alluded to, it is a – there is no injury or illness, other than the preeclampsia, which we just discussed, that's alleged here. It's pregnancy. And she was seeking care for something that was really seeking preventive care. Assessment, monitoring, seeing an OBGYN is really preventive care. It makes that case very different from Carlson where there was an acute asthma attack that was left untreated and ultimately mistreated by the medical personnel. There was no direct denial of care by any defendant alleged here. What she really alleges is systemic failures. They were just – which is very different as well from any of the other cases where the failures – to the extent there was some failure in getting prenatal care, getting the prenatal care that she wanted, that was – there's no allegation that anybody did that deliberately, you know, with – in the intent to prevent her from getting care, that anybody actually refused her care, which is also unlike Watanabe where in Watanabe the medical nurse, the staff nurse said, you know, you should stop being a crybaby. You're not going to the hospital. I mean, that's deliberate indifference. I mean, you know, you can see that being – at least that was the allegation in the case. And you can see that being a deliberate indifference case. But that is not our facts. That's just not our facts here. How do you do a standard also? I think in standard they – it was the – through the grievance process that was considered notice enough for deliberate indifference. In standard there was no treatment – again, there was an illness in standard. There was an illness that was not being treated, hepatitis C. And there was a reason – there were administrative reasons for not giving him the treatment that were not medical reasons, but, you know, that they thought he should be transferred, await his transfer, non-medical reasons for not giving him transferred. And not getting him treated, excuse me. And he wasn't – he wasn't just challenging the policy there. He was – there was a refusal to treat in that case, treat an actual diagnosed illness in that case. But I guess my question would be then – because you're challenging that they were provided notice of her ailments, correct? They were not provided notice. But they do allege that she filed these grievances, right, through the system. Why is that not sufficient? She filed a BP-9, but it's not clear that the BP-9 even articulated any specific illness or injury requiring treatment. So it just says – it doesn't really say. The BP-9 was also done in February. So at that point, she had already actually been sent out. She had an ultrasound. She had seen a doctor. So, I mean, by March, she was seeing doctors. There was only one grievance filed? I think there was another one filed after the birth. Oh. After the transfer. After the transfer, I believe. So your position is that the grievance could be sufficient notice, but we just don't know what was said in that particular grievance? Exactly. We don't know what was said in that grievance and who received it other than Warden Dolgoff. It was addressed to Warden Dolgoff. As to the other defendants, there's no allegation that any of them received or were aware of that BP-9. What about the sick calls, though? The sick call? There were six sick calls. Right. And, again, we just don't know what was conveyed in those sick calls. So your view would be that that could be sufficient to provide notice, but because we don't know what was said, that's not enough to prove deliberate indifference? Well, right. I mean, a sick call could be anything. I mean, presumably it was to say, look, I'm pregnant and I want to see a doctor because I'm not getting my OB-GYN visits. But we really don't know what was in those sick calls or how specific they were. There's no allegation that she alleged that she, you know, pointed out to them that she was having symptoms that required immediate treatment. Should she be allowed to amend, if they could prove what's in those sick calls or the BP-9? BP-9. Yeah. Your Honor, I have to admit, no. She's already amended this complaint. She's on her third amended complaint at this point. The third amendment was actually filed after the notice of appeal in this case. So she's represented by a highly competent counsel who have had the opportunity to plead this. And I think the fact that the allegations are as vague as they are just reflects the reality of what she knows and what occurred and not just a pleading deficiency. Be mindful of your time. I am. So I would like to, I think, just move quickly to the qualified immunity issue. And for similar reasons to there not being a, you know, a new Bivens action here, there really is no, there should be qualified immunity for these defendants. There really is no, there's no allegation here that supports the finding of a constitutional violation, much less one that is clearly established. And for there to be a constitutional violation, there's got to be deliberate indifference to a serious medical need, and that deliberate indifference must have caused harm. And we don't have either one here. Under the relevant pleading standards in Iqbal and Twombly, the second amendment complaint doesn't adequately allege that constitutional violation. You know, let's say she submitted the sick calls. She expressed concerns about her pregnancy. But there's just not enough notice that there was any serious medical need. If there was a serious medical need, even at that time, is pregnancy alone a serious medical need? Probably not. But if there's some complication that requires treatment, you know, that wasn't alleged to have been made known to any defendant. So there's, and there's just no allegations that anyone was deliberately indifferent, unlike you do have conduct sometimes that, you know, that reflects somebody's attitude. You know, there's got to be a subjective intent of deliberate indifference. And there's nothing in here relaying that, suggesting that anybody had that level of intent. She, there's also a lack of causation of any harm. This is very unlike other cases where, you know, in all the other pregnancy-related cases that come up, the baby has died. Something has happened. Something has gone very wrong in the pregnancy. And they're really cases dealing with how to handle a preterm, you know, situation. And that just didn't happen here. When it did become emergent, and they were concerned about the high blood pressure, she was taken to the emergency room, and they induced labor. So everything did, you know, there's just no, there's no evidence that there was any harm here that resulted from the delay. And if, there's certainly nothing clearly established. And I see my time is running out, and I will defer. Yeah, I mean, so actually I think we went well over. Because I think the timer was set at 15. I think you used 11 minutes. Oh, I'm so sorry. So here's what we're going to do.  I'm so sorry. I'm not going to penalize you two. I'm not going to penalize you. So you're going to get extra time. Okay? All right. So you're going to go ahead and have four. You're going to have four for your rebuttal. And you're going to get, if you need it, counsel, you're going to get four extra minutes. Thank you, Your Honor. Yeah. Aloha, and good morning, Your Honors. I'm Jennifer Merkel. I'm here representing Nancy McKinney, Monte Wilson, Saeed Hosseini, Alicio Ricocco, and Gregory Barnes. So I want to start by just reiterating that we combined our argument for today for your convenience. I'm going to try and focus specifically on some of the more novel issues that are specific to one of my clients, Monte Wilson. But as an overall statement, I want to remind the Court that what we're actually assessing is whether or not the complaint here established a claim of cruel and unusual punishment. The vehicle for that should be through alleged deliberate indifference to a serious medical need for treatment. In answer to your question earlier, Your Honor, I do believe that pregnancy itself would not meet the constitutional legal definition of a serious medical need for treatment. It's a natural process. Women across the world have give birth without intervention. But she's alleging complications from that pregnancy. Yes, and I was getting to that, Your Honor. She actually did not allege any diagnosed complication that required treatment. On paragraph 49 of the second amended complaint, she did indicate that at that point there was some suggestion that she may have preeclampsia, which is high blood pressure, chronic high blood pressure accompanied by protein in the urine, which could lead to serious harm. Obviously, you know, that's the only allegation we have before us in the second amended complaint. So she wasn't actually diagnosed with preeclampsia, nor is there any indication that preeclampsia required any specialized treatment. There's no allegations in the second amended complaint. Didn't she allege weight loss, regular loss of amniotic fluid, cramping, pain? I mean, those are serious. Those are symptoms, so symptomology that requires her to go see medical. And I would just point out that the second amended complaint includes a laundry list of times where she did seek and obtain medical treatment, although obviously her lack of full exposition of what happened during those encounters is notable, but obviously she only indicated what she chose to recitate. So in the electronic record, pages 80, 90, 90, paragraphs 3 to 6, 96 to 97, 98, she saw Dr. Smith. She saw Dr. Fish. She had ultrasounds done. She saw Dr. Eaton in the ER, who, as we know, in the complaint, she alleged, said, there's nothing for me to do. Why? Because she wasn't presenting with a serious medical need that required treatment. She was presenting with a pregnancy for which routine medical care would have been appropriate, and that would, in this day and age, include consultation with an OB-GYN, as the OB-GYN determined. But that is not constant.  Well, you would concede, though, if she had preeclampsia and your clients knew about it, that would be a deliberative difference if they did nothing. No. If she had preeclampsia and the clients knew about it and the treatment for preeclampsia is bed rest, which is the treatment for preeclampsia, and they did something to prevent her from having bed rest, they compelled her to work, they made her walk, you know, ridiculous amounts, then we might have a deliberate indifference claim, Your Honor. I would acknowledge that. But because they are denying her access to her treatment, which would be the bed rest. But simply having preeclampsia and being aware of that is not in and of itself a constitutional violation. So, Your Honor, I would also just, again, I'm just trying to generally give some more context. The other issue that I would like to point out here, what distinguishes this situation as to mostly my defendants, but as to all defendants, is that there was a class action pending throughout the entire time of this pregnancy, a class action which the record demonstrates the judge was aware of, the class counsel represented to the judge in one of the hearings that this issue would be covered by the class action, and the Court proceeded to, you know, prescribe their individual Is that a basis to make this a new Bivens claim because this is under a court supervision at the time most of the events happened? Well, because the provision of care that she was receiving under the court's supervision related to the duty of care of the Bureau of Prisons under 18 U.S.C. 4042, assuming that the court was exercising its duties, I mean, exercising its authority under the Mandamus Act to hold the Bureau of Prisons accountable for providing the duty of care they were statutorily required, a duty which is far different than the Constitution mandates, right? I'm sorry. You didn't answer my question. Is this a new context because of that court supervision? It would be a new context because the court was intricately involved, and you're asking individual defendants to say not only do the doctors, the medical personnel or the judge know what's right, I have something better in mind. Like, they couldn't you're asking them to say that they were relying on this mechanism that was in place and was actually functioning to provide her whatever treatment was deemed necessary and say, I know better. And none of these people are in a position to do that, nor should they be. Do you, as a judge, would you want some peon bureaucrat deciding that your judgment isn't fair or that they should take it upon themselves to do something that's not readily before the court? They had every opportunity and multiple attorneys available to, if they felt that there was deficient care pursuant to what the need was, to come back to the court. They had access to class counsel to pursue injunctive relief that way. So there were many different avenues in this case which goes to the assessment of whether or not there were different ways in which these rights or these conditions or these issues could be raised. All right, so counsel, I'm going to jump because you're also way over as well. Oh, I have a minute and 46 on me. Oh, no, see how time's going up? Pardon me. Red light means stop. I know it's confusing. When we have this many lawyers, this is usually what happens. And I apologize. I usually give each counsel seven minutes and four minutes, and I didn't instruct the CRD to do that. That's my fault. So you're finished. Thank you. Thank you. Now, we'll hear from the other side. Good morning, Your Honors, and may it please the Court. Lauren Cain from Kekker, Van Ness, and Peters. Ms. Ocean Francis was denied all meaningful prenatal medical care for a five-month period while she was incarcerated at FCI Dublin. During her time at Dublin, Ms. Francis did everything she could to seek medical attention for her painful and frightening pregnancy complications. She submitted at least six sick calls, which were ignored, and I would direct the Court to paragraph 44 of the Second Amended Complaint, which states that she submitted at least six sick calls to Dublin staff regarding her symptoms, which, on information and belief, defendants Dolgov, Wilson, Hussaini, Agostini, and eventually McKinney were all aware of. You didn't plead what was in those sick calls, though, right? That is correct, Your Honor. We do say that sick calls are the recommended method for requesting the health care. She is requesting health care. No, I agree, but I think it's important to know what was said in those sick calls. We just don't know. We do know that she submitted the calls, quote, regarding her symptoms. Right. And then we discuss the symptoms throughout the complaint. Yeah, but that's not the same. I mean, because the point is the deliberate indifference is they have to know specifically the problem, that it's serious, and they ignored it. But just saying there's a sick call about symptoms, I don't know if that meets that standard. I agree, and we did not just plead only sick calls. She also personally informed her unit manager, who did nothing.  About concerns about her pregnancy. She also filed a BP-9 grievance form, which I would direct the court to. I was wondering if you were given an opportunity to replete. Could you tell us what was in the sick calls or the BP-9? We have not had the benefit of discovery, of course. We're just pleading at this stage, and so, you know, we can amend, I suppose, and discuss in more detail her specific symptoms, but we do think that it is important to discuss her symptoms, discussing the BP-9 grievance form, which recounted her weight loss and the neglect she faced up to this point, and requesting that the warden provide her with prenatal care and a proper diet. Yeah, it's just, you know, it's somewhat vague. You know, weight loss could be serious. It could be she could have lost, you know, 15, 20 pounds, or she could have lost two pounds, so we just don't know, right, and whether or not that would meet the deliberate indifference test. We do discuss in the complaint that she had rapid weight loss of over 30 pounds, and this is, of course the case. But then we don't know if the prison officials knew that, though. That's the problem. And, I mean, the reasonable inference to draw from our allegations is that she submitted these calls regarding her symptoms and recounting her weight loss and the neglect she faced up to that point. I don't think the standard is for us to quote verbatim what was in the sick call. You know, we're looking at whether or not these defendants were on notice, and they were.  Of deliberate indifference. So they need to give they have to know specifically of a serious medical condition and then ignore it, right? Since we don't know what they were told, I just don't know how we could say that you can apply deliberate indifference to that standard. Let me ask you this way. To me, this most serious allegation is the preeclampsia condition, which I do think is very serious. Is there an allegation that they, that any of the defendants knew about the condition of preeclampsia? Ms. Francis was eventually diagnosed with preeclampsia. This is in paragraph 85 in, this is April 23rd of 2024. There's no specific allegation that I'm aware of stating that each of the defendants were aware of the preeclampsia, but of course she was not diagnosed with the preeclampsia. And so I don't think that she should be punished just because she wasn't diagnosed. No, I get it. I mean, it's a serious issue. But if they didn't know that she was having preeclampsia, how can you say that they were being deliberately indifferent? Because they should have known based off of the symptoms that she submitted in her case. I mean, she submitted six sick calls, four of which they outright rejected the BP-9 grievance form, and she was personally informing staff. And so taken all together and taking all reasonable inferences in her favor, which the Court is required to do at this stage, that was sufficient notice. So it's almost like the theory would be willful blindness, that they just, they had every opportunity to know something was wrong and they just didn't do it, so that can't be a defense of deliberate indifference because the reason why they didn't know is because they were deliberately indifferent to finding out. Exactly, Your Honor. So let me ask you this. So Watanabe is a very good case for you, but a lot of people on my court are not fans of that case, and we'll see what the Supreme Court does with that case. So imagine a world, I'm not saying agree with me, but imagine a world where Watanabe is reversed. It goes the other way. What's left of your case if that happens? What's left for us is Stenard, which Judge Bumate brought up. And Stenard dealt with delay in hepatitis C treatment where the plaintiff complained of abdominal pain, but there was no noted lasting injury from the delay. The Court acknowledged that Stenard received less deficient care than the inmate in Carlson, but still found the case to be a, quote, replay of Carlson. And then even just two months ago in Schwartz v. Miller, same story, where the thyroid testing and a five-month delay in receiving thyroid medication. Now, Schwartz, I mean, I'm familiar with that one.  Schwartz was in large part based on Watanabe. So I guess what I'm trying to figure out is that is this like a, are we pulling a card out of the top of the card pyramid, or are we pulling a card out of the bottom of the card period with Watanabe? You're saying it's the top and the structure would still exist. I am. We are arguing that this claim falls within the well-established Bivens context of deliberate indifference to a serious medical need as established in Carlson v. Green. We fall under the Carlson umbrella. We are not hinging our entire claim to Watanabe, which, of course, is still good law, as you noted. This Court does need to follow it regardless of, you know, if and until something happens to it. We are relying on Stenard. We are relying now on Schwartz. And the Bivens claim challenges the exact same type of conduct, which is deliberate indifference to a serious, and here life-threatening, medical need. And because her claim arises in the same context as Carlson, it is cognizable under Bivens, and no Step 2 analysis is required. Can I ask, at least for the Victorville defendants, at that time she was under court supervision, right? Her medical care was under court supervision? Your Honor, I would disagree that her medical care was under court supervision. This is not a case where there was, you know, a court-appointed monitor or any sort of receivership. There was a stipulation, and then the district court ordered the stipulation providing baseline prenatal care, which included biweekly visits with an OB-GYN. So I'm just wondering why doesn't that make this a new context, right? Where I haven't seen a case where a court is intimately involved with the health care of an inmate, and we're still providing a Bivens case, a new cause of action, where, you know, there's an alternative remedy when the court is involved. Don't you agree? Like the court could order sanctions, can order injunctive relief. So I just don't know why you would need Bivens in that context. First of all, we would disagree that the court was intimately involved. Even, you know, as the Victorville defendants were defying the order, it's not the situation where, you know, the court stepped in and ordered more care or did anything other than order the stipulation, which we requested and agreed to. That said, as you just discussed, as far as administrative remedies or placing this outside of a Bivens context, I would argue that that falls within Bivens Step 2, which, of course, is also a lot of what we're discussing within Watanabe and bringing that up to the Supreme Court. We are saying here there's no need to discuss Step 2. We are not arguing special factors here because this claim falls clearly under Carlson, and there's no need to even proceed to Step 2. Well, Carlson did not have a court supervision. That to me seems like a big difference. Again, I disagree that this was court supervision. You know, we received a court order to be — we received a court stipulation and order after she filed a pro se habeas petition because she was so desperate to receive just bare minimum medical treatment. This is not included, you know, in the Ziegler factors. There's no reason in my mind that this would be a meaningful difference from Carlson so as to place this outside of the Carlson umbrella. And then can I ask about the transfer defendants? That seems to me also to be a different — even excluding — even assuming Watanabe and all that, that seems to be a different context also to me because I — as I read that complaint, that part of the complaint, it's about, you know, excessive force in transferring, not in deliberate indifference. We are not arguing an excessive force claim here. This is still an Eighth Amendment deliberate indifference claim. It is just a different flavor from what we discussed earlier. She has stated a sufficient claim here because it further falls under Carlson because she has plausibly alleged that Appellant Wilson knew of her serious medical need, that she was 7-1⁄2 months pregnant and experiencing serious complications, and that by illegally restraining her during transfer, he forcefully strapped her to a gurney and used restraints on her shoulders, arms, thighs, and ankles in direct violation of 18 U.S.C. 4322. So isn't that a problem for you, though? There's a statute directly on point, correct, on how to transfer pregnant inmates. That is correct, Your Honor. And so Congress — and that's a relatively new one, the First Step Act, right? It was part of the First Step Act, I believe. Anyway, it's a relatively new statute, and Congress did not create a cause of action, even though they were concerned enough about transfer of pregnant inmates to outline the procedures to do so. So why is that not a sign that we should not be granting a new context here? Same answer as before, Your Honor, because we are not operating in Step 2 of Bivens. Therefore, that is not a relevant factor. Right now, we are talking about whether or not this is meaningfully different from Carlson. We are in Step 1. And so we're looking at, you know, the severity of the harm, the severity of the officer's misconduct. And then, if it does fall outside, we will move to Step 2. But here, we are not arguing Step 2. And the fact that there is a statute on point, of course, provides notice under qualified immunity. Speaking of qualified immunity, I would like to be sure to address that point. As to the first prong, Ms. Francis has alleged an Eighth Amendment violation against each appellant. There is no real dispute, as we discussed, that Ms. Francis had a serious medical need. The attorney argument does not replace the allegations in the complaint or the medical judgment of the medical professionals who treated her. Our brief lays out the allegations against each appellant, demonstrating personal knowledge and involvement. We are not making a systemic claim, as they have argued. There were, of course, systemic issues at Dublin Prison, but that is not what this complaint is about. At minimum, she has alleged that the appellants knew that she was pregnant, were aware of her pleas for help, and knew that nobody was responding. Second, it is clearly established that deliberate indifference to a prisoner's serious medical need violates the Eighth Amendment. The right was established in Estelle v. Gamble, and the circuit has continuously reaffirmed that delay in medical treatment can establish a constitutional violation. In Jet v. Penner, for instance, this court found prison officials to be deliberately indifferent when they provided some treatment, but they delayed specialty care for a broken thumb against the advice of doctors. So, too, here. Appellants are not absolved of all liability simply because Ms. Francis received some care. This case actually takes it a step further than Jet, given the prenatal context, where the dangers of delay in treatment are enhanced, given the time-sensitive nature of pregnancy, and the consequences are potentially deadly. The risk is obvious. I'll end by noting that the order appealed from was not a close call. The only question the district court thought was a close call was whether this appeal is frivolous. Ms. Francis has sufficiently pleaded her claims. She suffered serious pregnancy complications, alone and scared, and she asked for treatment in all of the ways that she could. Appellants ignored her pleas for help and neglected to get her the care that she desperately needed. She deserves an opportunity to prove her claims and hold appellants accountable. We respectfully request that this court affirm the district court's denial of the motion to dismiss. I'm happy to answer any additional questions from the court. All right. Thank you very much, counsel. Good morning. I'm Jonathan Lawrence. I'm the attorney for Art Dolgov, a warden at Dublin. But I'm going to just sum up for all of us, all defendants, there's no need to remand this for a further amendment. It will not cure the following problems. Here are the points I want to make. There's only four. Number one, I could find no other medical care case where a federal district court judge immersed himself during the pendency of an inmate's incarceration to dictate care in real time. There were three court hearings. These are pled. I don't need to go outside the second minute complaint. Paragraphs 54 and 64 talk about the three hearings where this judge was ordering care at the suggestion and direction of an entire law firm and with the benefit of class counsel who weighed in at one of the hearings. So how does that play into this case? It's completely new Bivens context. Okay. And that's the point. There's never been a case under Bivens. And before I go to qualified immunity, let me just sum up the Bivens argument this way. Five doctors are named in the second amended complaint with nine dates of care. There's never been a Bivens case that says you have a complete deliberate indifference even though you took an inmate to five doctors over nine dates. And there's the district court case in Tanner, which is a New Mexico case, which is in my brief, talks about the difference that the Tenth Circuit acknowledges between providing some care and no care. Some care removes it from Bivens. No care is actionable. I hope that this Court will take the time to look at the four Ziegler factors because that's what controls this case, not Stannard, not Carlson. It's now Ziegler, Ziegler v. Abbasi. And let's focus on the last three of those factors. The specificity of official action is missing. And then the last two factors, the extent of judicial guidance, and I'm not being snarky here, judicial guidance. I'm sure they intended for it to be circuit court guidance, but we had district court guidance. If that's not satisfying Ziegler to remove this from Bivens, I don't know what else is. And then the district court didn't come into play until Victorville, right? No, no, no. The district court became involved in Feb — I'm sorry, Your Honor, I can't offer your question, but my time is going. The district court became involved immediately after the filing of the 2241. This was a 2241 case. And — So how many months pregnant was she at that point? Well, she learned she was — I don't understand the gestational table. She came into the prison, I believe, in late October, and this was in February. So she was pregnant February, March, April, and she delivered May 15th. So you've got a four-month span where she's got judge, law firm, two law firms, and five doctors and nine medical appearances. And then the last — what's interesting here is the last Ziegler factor is the risk of disruptive intervention by the judiciary. I'm not criticizing Judge Chabria, but when you're fully immersed, it's hard to say that we should allow a Bivens action and we don't want to disrupt. We have a case where they did not allege any harm to the mother or any harm to the  They didn't allege any injury or illness. All the pregnancy cases, unfortunately, resulted in a stillborn. And in that respect, please, if you'll notice in paragraph 49, there's a risk of preeclampsia. This is fact-pled, not notice-pled. And in paragraph 85, there are two adjectives dealing with preeclampsia. One is suspected, and then the other one talks about she was tested. Plaintiffs' counsel stopped far short of saying that the test was positive. They did not say there was a diagnosis. I just want to turn quickly to qualified immunity. The fact that you have judicial intervention is what grants these defendants their entitled qualified immunity, because when a judge takes over an inmate's care and they have lawyers there, not the defendants. I'm talking about plaintiffs. She's got lawyers there, and then these government officials are told, go do this, go do that. What they were told is take her to her medical appointments. And the Second Amendment complaint admits that she was taken to her medical appointments. How are they supposed to suspect that they're violating the Constitution by following the judge? Right? And that's the test is, did they deliberately, were they deliberately indifferent to this inmate in violation of a constitutional standard? Did they depart from the Constitution? They've got a federal judge telling them what to do, and they simply did it. I don't see how we could say that they're not entitled to that immunity. That's what makes this case unlike any other and removes it from Watanabe. If there are no questions. No. I was going to say, I went over, and I apologize, but thank you for hearing me out.  Thank you, counsel. Thank you both, Your Honor. I especially want to thank Ms. Cain and your law firm for, you know, doing the pro bono work. It's probably a good break from discovery disputes, but nevertheless, we do appreciate you stepping up to the plate and handling this one. So thank you. All right. This matter is submitted. Thank you to all the arguments and briefing in this case. And we'll go on to the last one.
judges: GOULD, OWENS, BUMATAY